**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| SYZYGY INTEGRATION LLC, <br><br> Plaintiff, <br><br> v. <br><br> BRYAN HARRIS, <br><br> Defendant. | Civil Action No. _____ <br><br> **Jury is Contractually Waived** |

## VERIFIED COMPLAINT

Plaintiff Syzygy Integration LLC ("Plaintiff" or "Syzygy"), by its attorneys, Jackson Lewis P.C., hereby brings the following Verified Complaint against Defendant Bryan Harris ("Defendant" or "Harris") for:

(a)  Breach of the Non-Competition provision found in the Operating Agreement between the parties, dated August 14, 2020;

(b)  Breach of the Non-Competition provision found in the Employment Agreement between the parties, dated February 2018;

(c)  Violation of the Computer Fraud and Abuse Act, predicated on Harris's destruction of Syzygy's proprietary and confidential information found on the Company's laptop which Harris used during his employment with Syzygy;

(d)  Violation of his fiduciary duty to Syzygy as an owner of the Company;

(e)  Inevitable disclosure of confidential information by Harris;

(f)  Conversion of Syzygy's property by Harris;

(g)  Tortious interference with Syzygy's contracts and prospective contracts by Harris;

(h)  Misappropriation of Syzygy's trade secrets in violation of the Pennsylvania Uniform Trade Secrets Act ("PUTSA"); and

    (i)      Misappropriation of Syzygy's trade secrets in violation of the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831, *et seq.*

For its Verified Complaint against Harris, Syzygy states as follows:

## PRELIMINARY STATEMENT

1.     Syzygy is a Pennsylvania LLC, and Wesley Mitchell is its Founder and President.[1] Mitchell founded Syzygy in June 2016 with a focus on tactical operations and providing better situational awareness and communication integration to military, police, and emergency-response personnel in federal, state and local service, as well as to private companies.

2.     Syzygy provides sensor integration, sensors, mobile development, user experience and interface (UX/UI), software development and IT operations ("DevOps") automation, and other services to obtain its most lucrative contracts by competing for requests for proposal ("RFPs") with the Department of Defense, Department of Homeland Security, and Department of Justice, among other clients.

3.     Defendant Bryan Harris was Syzygy's first employee, engaged in all aspects of Syzygy's business and privy to every bit of confidential and proprietary information held by the company.  Harris began his employment in February 2018 and was offered and accepted part ownership of the Company in August 2020.

4.     Harris signed two Non-Competition Agreements, one part of his Employment Agreement presented to him February 2018, including a one-year post-termination restrictive period, and the other part of the Operating Agreement signed in August 2020 when he became part owner of Syzygy, containing a five-year restrictive period.

---

[1]    Mitchell's detailed declaration is submitted herewith setting forth the circumstances of Defendant's employment from his hire through termination.

5.      Even though Harris signed both restrictive covenants and had access to Syzygy's confidential, proprietary, and trade-secret information throughout his tenure with the company (which access was dramatically increased upon becoming a part owner), Harris accepted employment with a direct competitor of Syzygy, Sherpa 6, approximately two weeks ago, in a capacity that puts him in direct competition with his former employer, causing a direct threat to Syzygy by the depth of Harris's knowledge of Syzygy's work and the inevitability that the knowledge he has will be or has been shared with Syzygy's competitor, thus interfering with Syzygy's ability to successfully compete in the RFP process by which government contracts are awarded and interfering with Syzygy's current client relationships.

6.      Harris violated the trust put in him, as well as his fiduciary duty and duty of loyalty to Syzygy, when he left his employment under circumstances giving rise to tremendous distrust, including that:

(a)      Harris lied to Mitchell when he told him he did not know what he was going to do upon his resignation or where he would go;

(b)      Mitchell learned of Harris's intentions to go to Sherpa 6 by virtue of a conversation with Sherpa 6's CEO instead of from Harris, his trusted employee and co-owner;

(c)      Harris returned his laptop to Syzygy wiped clean of any and all company information, but having left evidence that he downloaded thousands of files in his last months of employment, leaving Syzygy to perform significant rework on current government projects in order to recreate the information destroyed by Harris;

(d)      Harris neglected to complete his application for security clearance when asked to do so by Syzygy in February 2022, but instead continued the security clearance

3

process as an employee of Sherpa 6 on April 1, 2022, the day after he and Sherpa 6 both received letters from Syzygy's counsel advising that Harris's employment with Sherpa 6 would violate his restrictive covenants; and

(e)     Harris refused to speak to or communicate in any way with Syzygy regarding the restrictive covenants that he knew were in place, that he had a hand in drafting, and that he clearly violated.

7.     By his conduct, Harris left Syzygy no choice but to seek a Permanent Injunction barring him from accepting employment with Sherpa 6 for the duration of his Restrictive Covenant as a part owner of Syzygy, five years.

## PARTIES

8.     Syzygy is a Pennsylvania Limited Liability Company with its principal place of business in Conshohocken, Pennsylvania.  Syzygy transacts business in this judicial district from its offices in Conshohocken, Pennsylvania.

9.     Defendant Bryan Harris was formerly employed by Syzygy as an Engineer, as Operations Director, and then shared ownership of Syzygy from August 14, 2020, until his resignation and subsequent termination on March 28, 2022.

10.     Upon information and belief, Harris resides at 2455 Lake Cohoon Road, Suffolk, Virginia 23434.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) by virtue of the diversity of citizenship of the parties and the fact that the matter in controversy exceeds the sum of $75,000, exclusive of interests and costs.  In addition, the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Syzygy has asserted claims

under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*., and the Defend Trade Secrets Act, 18 U.S.C. § 1831, *et seq.*, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Syzygy's state law claims because those state law claims arise out of the same operative facts as the federal claim.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because Syzygy is organized as an LLC pursuant to Pennsylvania law, is located in Pennsylvania and Harris availed himself of the jurisdiction of this Court by doing business in Pennsylvania during the time he worked for Syzygy and because a substantial part of the events giving rise to Syzygy's claims occurred in this judicial district.

13.     Further, Harris agreed to submit to jurisdiction before this Court pursuant to Paragraph 11.19 of the Parties' Operating Agreement, dated August 14, 2020, a copy of which is attached as **Exhibit D**.

14.     Harris agreed to place venue in this District Court pursuant to Paragraph 11.19 of the Operating Agreement between the parties, dated August 14, 2020.

15.     Harris agreed to waive a jury pursuant to Paragraph 11.19 of the Operating Agreement between the parties, dated August 14, 2020.

<u>**SYZYGY'S BUSINESS**</u>

16.     Syzygy was organized as a limited liability company pursuant to the Pennsylvania Uniform Limited Liability Company Act on June 30, 2016.

17.     Syzygy business purpose focuses on tactical operations to provide better situational awareness and communication integration to those who defend our country, including sensor integration, autonomy, mobile development, user experience and interface (UX/UI), software development and IT operations ("DevOps") automation, product development, system

sustainment and support, training, and a few other core competencies to truly encompass the vision of better situational awareness for those who protect the homeland.

18.     Syzygy operates with the core values of Integrity, Ownership, Deliver Excellence, and Diligence.

19.     Mitchell introduced Harris as Syzygy's very first employee to Syzygy's customers, integrating Harris into Syzygy's relationships with them (save for one small customer brought in by Harris and Mitchell together), as well as every customer Syzygy is pursuing.

20.     Harris benefited throughout his employment from Syzygy's reputation for superior results and integrity in its business practices.

## HARRIS'S EMPLOYMENT WITH SYZYGY

21.     Harris is a veteran of the United States Air Force who met Mitchell in 2013 and worked with Mitchell on several projects prior to joining Syzygy.

22.     Using saved company profits, Syzygy hired Harris as its first employee at which point Syzygy had sufficient funds to provide for Harris and his family for approximately twelve to eighteen months.

## HARRIS'S FIRST NON-COMPETITION AGREEMENT WITH SYZYGY

23.     Harris's offer letter of December 2017 is attached as **Exhibit A** and signed by Harris and includes an acknowledgment that Harris was required to sign a Non-Competition Agreement prior to hire, which he agreed to do as evidenced by his signature.

24.     On or about February 1, 2018, Syzygy sent an Employment Agreement to Harris containing the Non-Competition provision, supported by adequate consideration. The Employment Agreement is attached here as **Exhibit B**.  Harris later signed an updated version of the Employment Agreement, which is attached here as **Exhibit C**.

25.     The relevant terms of the Employment Agreement include the following, Paragraph

8:

Non-Competition; Non-Solicitation.

a.  For the Restricted Period, the Employee shall not, directly or indirectly, (i) engage in or assist others in engaging in the business of the Company in the Territory; or (ii) have an interests in any entity that engages directly or indirectly in the business of the Company in the Territory in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant.  As used herein, the terms (A) "Territory" shall mean any geographical location in which the Company conducts, or plans to conduct, business; and (B) "Restricted Period" shall mean one (1) year following the termination or expiration of this Agreement.

b.  During the Restricted Period, the Employee shall not, directly or indirectly: (i) cause, induce or encourage any material actual or prospective client, customer supplier or licensor of the Company (including any existing client or customer of Company and any person or entity that becomes a client or customer of the Company), or any other person or entity who has a material business relationship with the Company, to terminate or modify any such actual or prospective relationship; or (ii) hire or solicit any person who is offered employment by Company or is or was employed in by the Company during the Restricted Period, or encourage any such employee to leave such employment or hire any such employee who has left such employment, except pursuant to a general solicitation which is not directed specifically to any such employees or any such clients, customers or suppliers.

26.     Although Harris signed the Employment Agreement on March 24, 2022 (**Ex. C**),

he acknowledged it from the date of his hire going forward by acceptance of the offer letter (**Ex.**

**A**) and by acceptance of the consideration provided to him for the Agreement, including accepting

a significant starting salary that increased thereafter, growing approximately 44% by May 2021,

in addition to receiving a signing bonus and other significant bonuses and benefits.

## HARRIS'S COMPLETE INTEGRATION INTO SYZYGY

27.     Harris was trained throughout his tenure on how Syzygy captures, retains, and grows business and was given access to all of Syzygy's current and potential customers under Syzygy's contracts as well as access to all new business being developed.

28.     With one minor exception, all of the customers with whom Harris worked at Syzygy resulted from Mitchell's pre-existing relationships.

29.     Harris developed a deep knowledge of Syzygy's entire operation, learning its trade secrets and confidential information, and this knowledge is why the Operating Agreement (**Ex. D**) included a non-compete clause with a restrictive period of five years, to protect the budding company that now is not even six years old and to safeguard its customer relationships and competition-sensitive information that could easily help a competitor like Sherpa 6 capture a large portion of Syzygy's business, forcing it into a downward spiral.

30.     Harris had a high level of knowledge of Syzygy's financial affairs and records and there is no other employee of Syzygy (past or present) who has had access to more proprietary information belonging to the company than Harris.

31.     For approximately six months prior to his termination, Harris was responsible for all hiring, candidate outreach, company advertising on recruiting boards, interviewing, and extension of offers, helped with employee onboarding, and had access to every resume for every potential candidate for Syzygy and hired a good portion of Syzygy's current staff directly.

32.     Harris led Syzygy's Operations Team for multiple years and ran all program management across the company and all of Syzygy's information technology operations, having access to information about all of Syzygy's customers and access to all its proprietary information. Among other things, Harris had access to contact information for Syzygy's current and prospective

customers, detailed information on Syzygy's vendors and suppliers, pricing information on Syzygy's current and prospective government contracts, job rates and personnel rates shared only with Syzygy's government clients, internal financial information, including profit-and-loss statements, compensation data for nearly every employee at Syzygy, salary bands for each position at Syzygy, and comprehensive roadmaps detailing Syzygy's current business and business-development plans for each of its product lines and sectors.

33.     Harris was included in all large Syzygy business development efforts, helping with teaming agreements, proposal strategy, customer strategy, and customer-shaping activities.

34.     Harris led Syzygy's iOS mobile portfolio to include the development of the iTAK (Team Awareness Kit / Tactical Assault Kit) system and was trained on government funding, government program capture, and government roadmaps and was given full access to Syzygy's multi-million-dollar (per year) mobile portfolio to run the team, hire candidates, onboard them, and manage candidates and newly hired employees, all extremely helpful skills for a direct competitor like Sherpa 6.

35.     Harris worked through employment agreements, non-disclosure agreements, and termination agreements with numerous Syzygy employees, even helping to enforce these agreements.

36.     Harris is intimately familiar with the terms of these agreements and the meanings of the terms in the agreements and so he cannot reasonably deny understanding and knowledge of his own restrictive covenants.

37.     Recently, in December 2021, Harris requested legal guidance from Richard Lewis, Esq., Syzygy's general counsel, regarding termination legal documentation, ostensibly to help further enforce the company's covenants post-employment, and he urged Mitchell to have all

terminating company employees "read out" and forced to sign a document reiterating their restrictive covenants, something that Harris himself was unwilling to do when the time came.

38.     Harris also ran the Sensor Network Access Point ("SNAP") Program, Syzygy's flagship product where the company stores its internal intellectual product for sales, and includes Syzygy's trade secrets and vendor list.

39.     Harris ran SNAP for multiple years and was instrumental in setting up the supply chain for the program, running the software and hardware development teams, and fielding and supporting the program.

40.     Harris also ran the Argos Dismounted Program (sensor platform of day and night cameras and radar), Syzygy's second-largest product with the second-largest amount of Syzygy's intellectual property.

## HARRIS'S OWNERSHIP INTEREST IN SYZYGY

41.     As stated above, Harris became an owner in Syzygy in August 2020 as memorialized in the Operating Agreement (**Ex. D**).

42.     The relevant terms of the Operating Agreement are as follows, Paragraph 5.9:  Non-competition and Non-solicitation:

> a. In exchange for their membership interest in the Company, in addition to any other standalone restrictive covenant contained in such Member's employment agreement or elsewhere, each Employee Member hereby agrees that for so long as such Employee Member is a Member of the Company and for a period of five (5) years after the sale of his Membership Interest for any reason (the "Restriction Period"), such Employee Member will not, indirectly or indirectly, do any of the following:
>
>> (i)      engage in, or invest in, own, operate, manage, finance, control or participate in the ownership, operation, management, financing or control of, act as a consultant or advisor to, be employed by, associated with or in any manner connected with, or render services or

other advice or aid to, or guarantee an obligation of, any individual or entity engaged in, or planning to become engaged in (each, a "Competing Organization"), any other business whose products, services or activities compete in whole or in part with any other business engaged in by the Company, in the United States; provided, however, that an Employee Member shall not violate the foregoing restrictions by reason of ownership of less than 5% of the outstanding equity of any publicly-traded Competing Organization;

(ii)      solicit the Company's customers or clients for the purpose of offering any investment management service, or any investment management product, that competes directly with the Company or provide any investment management services or any investment management products to any of the Company's customers, or clients that were provided to such customers or clients while such Employee Member was a Member of the Company; or

(iii)      employ any individual or entity who is an employee of the Company or any of its Affiliates, or take any action intended to have the effect of causing any such employee to terminate his or her employment with Company or any of its Affiliates.

b.   Each Employee Member acknowledges and agrees that the covenants set forth in this Section 5.9are reasonable with respect to their duration, geographic area and scope. In the event of a breach by an Employee Member of any covenant set forth in Section5.9, the term of such covenant will be extended by the period of the duration of such breach.

c.   Each Employee Member acknowledges and agrees that subsection (a) and (b) of this Section are intended to protect and preserve the legitimate business interests of Company. Each Employee Member further acknowledges and agrees that any breach of either subsection (a) or (b) of this Section 5.9 will render irreparable harm to Company. In the event of a breach of either subsection (a) or (b) of this Section 5.9, the Company shall have available to it all remedies available at law or equity, including, but not limited to, temporary or permanent injunctive relief to restrain such Employee Member from violating subsection (a) and/or (b) of this Section5.9.

d.  Each Employee Member will not, at any time during or after the Restriction Period, disparage the Company or any business conducted by the Company or any equity holder, member, manager, officer, agent or Affiliate of the Company.

e.  During the Restriction Period, each Employee Member will, within ten (10) days after accepting any employment, consulting engagement, engagement as independent contractor, partnership or other association with any third party, advise the Company of the identity of the new company, client, partner or other individual or entity with whom such Employee Member has become associated. The Company may serve notice upon such individual or entity that such Employee Member is bound by this Agreement and furnish such individual or entity with a copy of this Agreement or relevant portions thereof.

f.  If any provision of this Agreement is determined or held to be illegal, invalid, or unenforceable, to the fullest extent permitted by applicable law this Agreement shall be considered divisible and inoperative as to such provision to the extent it is deemed to be illegal, invalid or unenforceable, and in all other respects this Agreement shall remain in full force and effect; provided, however, that if any provision of this Agreement is deemed or held to be illegal, invalid or unenforceable, the parties hereto hereby request that any court making such determination or holding reform this Agreement to add a provision as similar as possible to such illegal, invalid or unenforceable provision which would be legal, valid and enforceable. Further, should any provision contained in this Agreement ever be reformed or rewritten by any judicial body of competent jurisdiction, such provision as so reformed or rewritten shall be binding upon the parties hereto.

43.   Syzygy gave Harris an ownership interest without requiring any capital contribution or other "buy in" and, subsequently, Harris was paid out a substantial ownership draw in 2021.

44.   One justification for the five-year Restriction Period in the Operating Agreement is that government sales cycles for programs on which Syzygy bids are generally 36 months or greater, including government budget planning (12 months); gathering requirements (12 months);

and drafting proposals through to the selection of the competitor to whom the award will be granted (12 months or more and sometimes as long as 24 months).

45.     As a result of the extended cycle to obtain government work for which Syzygy competes, the programs Syzygy is working on now are in excess of one million dollars and will take years to fully mature and come out as profitable business, causing Harris if allowed to work for Sherpa 6 to be a risk to Syzygy for many years to come.

46.     All of the information that Syzygy shared with Harris is proprietary information. This information is still extremely sensitive as of the time of this filing and will remain so for multiple years as Syzygy continues to get business and build its products as detailed in its long-term business plans that the Harris knows well, including its strategies on how to capture customer business.

**SHERPA 6 IS A DIRECT COMPETITOR OF SYZYGY**

47.     Syzygy works in a highly competitive business environment and is a direct competitor of Sherpa 6, the company which Harris resigned in order to join.

48.     Syzygy and Sherpa 6 share Overlapping Technology spaces, including those that follow.

49.     Tactical Assault Kit (TAK as known on the Department of Defense ("DoD") Side) and Team Awareness Kit (TAK as known on the Department of Homeland Security ("DHS") Side) are both the same exact technology.  Both Sherpa and Syzygy specialize in TAK development, integration, sustainment, and support.

50.     Mobile Ad-Hoc Networking ("MANET") radio systems are integrated, supported, sustained, and fielded by both Sherpa 6 and Syzygy.

51.     Syzygy has a prime contract on exactly these types of radio systems as well as contracting directly with the MANET companies.  Sherpa 6 routinely does the same type of work on their contracts.

52.     Mobile Device Manager ("MDM") can be found on Sherpa 6's website as the premier product they reference, Watchtower:  (https://sherpa6.com/development-and-design/#watchtower).

53.     Syzygy's prime DHS contract (Contract No. 70RSAT21CB0000008) specifically calls for Syzygy to be working on an MDM solution to allow secure but unclassified information on personal (non-government-owned) cell phones.

54.     Syzygy "led the charge" on the TAK server secure-but-unclassified server services and support starting in 2017 across the DoD (Special Operations Command, conventional forces, etc.), DHS, Department of Justice (" DOJ"), national guard, state and local law enforcement, and state and local responders.

55.     In the federal DoD space, once a contract is in place the government is able to fund additional work that meets the statement of work ("SOW"), which work can also be awarded as a result of competitive bidding.

56.     As an example, a contract of five years may require additional competitive task order bids each year or may directly award additional competitive program scope, therefore the competitive relationship between Syzygy and Sherpa 6 does not end when the work is awarded but extends for years, putting Syzygy's information at risk for years, adding an additional justification to restrict Harris for five years.

57.     Syzygy is currently competing with Sherpa 6 on the AFLCMC Battlefield Air Operations program (RFP No. FA8629-21-R-5005, also known as the Special Warfare Systems

Engineering and Integration program).  This program has been worked by Syzygy as a business development opportunity since early 2021.  Both Syzygy and Sherpa 6 are bidding on the RFP as part of different teams competing for the same work and support.

58.  Syzygy and Sherpa 6 are both subcontractors on the active Applied Research Associates ("ARA") prime contract 47QFCA20F0022.  This contract was put in place for Syzygy at the end of 2020 and is valid through September 2025.

59.  Syzygy and Sherpa 6 were both subcontractors on the CACI prime contract W911NF-17-D-0013.  On this contract, both Sherpa 6 and Syzygy were competitors for work that was funded by the TAK Product Center ("TPC") in the Army, DoD.

60.  Syzygy saw small amounts of work on this program which could have been the result of Sherpa 6 winning additional efforts instead of Syzygy.

61.  The following Sherpa 6 press release reflects its competitive relationship with Syzygy: https://www.armyrecognition.com/weapons_defence_industry_military_technology_uk/sherpa_6_to_develop_technologies_for_u.s._army_ivas_program.html: "The IVAS Capability Set 1 is Microsoft's commercial HoloLens 2 with an integrated commercial, thermal sensor, and **Tactical Assault Kit** software and maps." (emphasis added)

62.  The Tactical Assault Kit (TAK) support, development, integration makes up *nearly 50% of Syzygy's current revenue*, and in previous years was closer to 90% of Syzygy's revenue.

### THE BUSINESS RELATIONSHIP BETWEEN SHERPA 6 AND SYZYGY

63.  Joe Dames is the Chief Executive Officer of Sherpa 6.

64.  Dames's profile is on Sherpa 6's website at https://sherpa6.com/dt_team/joe-dames/ and reads in relevant part:  ". . . below the battalion echelon to improve SA/C2 and tactical

communications; adopt the **Tactical Assault Kit** (TAK) for all conventional forces; and develop the Integrated Tactical Network (ITN)" (emphasis added).

65. Syzygy and Sherpa 6 share four core areas of expertise as follows.

66. <u>Systems Engineering</u>:  Syzygy has multiple system engineers on staff to work on communication, mobile app development, sensor integration, sensor development, back-end infrastructure, secure-but-unclassified server and backend systems, and more, and Harris was Syzygy's number-one system engineer for his entire employment.

67. Engineering also includes backend services as Syzygy and Sherpa 6 both work with TAK backend services, and both work in DevOps, software development of backend services, system administration, and sustainment of backend services.

68. Finally, still within Engineering is product sustainment, including sustainment of TAK for customers, providing help desk support, sustainment of mobile apps, communication infrastructure, tactical radios, and more.

69. <u>Development and Design</u>:  Both companies share Mobile Development, again with 100% overlap providing Android and iOS development for TAK as well as other applications, and Harris ran Syzygy's mobile development product lines for multiple years.

70. Within Development and Design, both companies provide full-stack development including mobile, web, and desktop as well as UX/UI design for all of the applications built by both companies, and Harris ran Syzygy's UX/UI design for the company for multiple years.

71. The companies' work in software development, including iOS, Android, Java, Swift, C++, and Kotlin, is another area of 100% overlay between Syzygy and Sherpa 6.

72.     <u>Mobile Device Management</u>: Sherpa 6 is more involved in this technology than Syzygy, although Syzygy is under contract to do mobile device management and still competes with Sherpa 6 on it.

73.     <u>Innovation, Network and Sensor Integration</u>:  The two companies have 100% overlap down to the actual network and sensor devices that are integrated, accounting for the Syzygy's largest growth path, and Harris ran multiple network and sensor integration efforts for Syzygy throughout his tenure, including its new product that will be released summer of 2022 that is an integrated sensor and network platform.

74.     Both Syzygy and Sherpa 6 are supporting and building Artificial Intelligence and Augmented Reality systems.

75.     <u>Markets</u>:  This is a competitive space for Sherpa 6 and Syzygy, including Command, Control, Computers, Communications, Cyber, Intelligence, Surveillance and Reconnaissance ("C5ISR"), the biggest market that Syzygy services.

76.     The Companies also compete in Logistics Sustainment, a smaller portion of Syzygy's business, as well as Training and Field Support, which capability Harris also supported for Syzygy.

77.     Syzygy's overlap with Sherpa 6 in the area of Aviation is primarily in aviation sensor integration, communication integration, field support, training, and operational sustainment, efforts that Harris also led, and was the area where Harris worked when he was initially employed by Syzygy.

78.     Both Sherpa 6 and Syzygy are just a few years old and are rapidly growing businesses, although Sherpa 6 is larger than Syzygy.

79.     In the Markets and Technologies sector where Syzygy does business, Sherpa 6 is one of Syzygy's fiercest competitors, proving itself to be able to capture large programs in the same technology space as Syzygy.

## COMMUNICATIONS REGARDING HARRIS'S DEPARTURE FROM SYZYGY

80.     It is especially disturbing that Harris was not the first person to disclose to Mitchell that he was trying to secure employment with Sherpa 6 and that Syzygy found out instead via a phone call with Joe Dames on March 18, 2022.

81.     On March 16, 2022, Mitchell had an in-person meeting with Harris at approximately 11:30 a.m. when Harris told Mitchell that he was resigning his position at Syzygy, but also lied by telling Mitchell that did not know where he would work next and had no plans, but thought he might take a vacation.

82.     Mitchell offered Harris the ability to stay on with Syzygy, to take a vacation and possibly transition to a position as a contractor if that was attractive to him, but he declined.

83.     In a call with Joe Dames on March 18, 2022, at approximately 10:00 a.m., Dames told Mitchell that Harris had submitted his resume to Sherpa 6.

84.     During this call, Dames and Mitchell also discussed the AFLCMC Battlefield Air Operations program, described above, leaving little doubt that Dames knows Syzygy has been working with a competing team on this program.

85.     On the topic of Harris's overtures to Sherpa 6, Mitchell immediately told Dames that Harris has a non-competition agreement and that, as Dames was aware, Sherpa 6 is a competitor of Syzygy and that Syzygy would make every effort to enforce the non-competition agreement, including taking legal action as necessary.

86.     On March 22, 2022, Mitchell set another call with Harris for approximately 4:45 p.m. and sent him the following agenda:

> **BH, this meeting is to start the discussion on the exit clauses. You have more agreements in place than most people.  Please also go in and sign the updated documents in Gusto that have been there for the last month or so (new NDA, new employment agreement, new handbook) prior to the call.  We need to go over the following:   No compete for employment, functions like TAK/CUAS/sensors, comms; Companies such as PAR, Sherpa6, Bryodyne, Mag, BBN, etc.; Non-Solicitation Customers/Team; Buy Back of Ownership; Richard and I are working through the process on this.  I expect to execute before or around your final day.**

87.     Harris told Mitchell he had worked out a career path with Joe Dames to work on multiple programs and to get his security clearance back, sponsored by Sherpa 6.

88.     Mitchell then told Harris that Sherpa 6 is a competitor and that he would be in violation of his non-competition agreement by accepting employment, and Harris asked for a waiver from Syzygy to work at Sherpa 6, acknowledging that they are competitors.

89.     Mitchell told Harris that he was surprised at this turn of events, since just the week before he had told Mitchell he had no plans, yet he now had a career path laid out with a competitor's CEO.   At the same time, Mitchell said that he would consider a waiver of the restrictive covenants.

90.     In another call with Harris on March 28, 2022, at 9:30 a.m., Mitchell advised Harris that Syzygy would not waive the non-competition agreement, despite his repeated requests to do so.  Harris also disclosed in this conversation that he had already set up employment with Sherpa 6 and had no alternative employment available to him.

91.     Harris offered to waive his rights to ownership in the Company, but Mitchell told him that Syzygy would buy back his shares of Syzygy per the Operating Agreement.

92.     On March 28, 2022, Syzygy's counsel sent Harris a letter, attached here as **Exhibit E**, telling him to "cease use of all Materials, Confidential Information, Inventions and Works . . . and disclose, return and deliver the same to the Company without retaining possession, custody or control of any of the information and execute a certification, under oath, that he has complied with this obligation."

93.     On March 31, 2022, in a text message exchange with Dames, in sum and substance, Mitchell advised him that he had warned Harris that his plans to work at Sherpa 6 violate his non-competition agreement, and that Syzygy was prepared to enforce the restrictive covenants that Harris signed.

94.     Mitchell subsequently reached out to Harris on April 6 at 9:34 a.m., 1:11 p.m., and at 3:46 p.m., and again on April 7, at 5:44 p.m., and April 8 at 9:07 a.m., but received no response, and Syzygy's counsel also reached out to Harris several times without response.

95.     Harris has held a position of trust at Syzygy since he was hired as Syzygy's first employee.

96.     Syzygy is always on a competitive footing with Sherpa 6 and as of the time of this complaint Syzygy is in the process of submitting another RFP for work for which Sherpa 6 is a competitor and on which Harris would have been identified as one of its key personnel, but will now likely be listed as one of Sherpa 6's key personnel instead.

97.     Harris has been deeply involved in that RFP and in all of the RFPs that Syzygy has submitted over the years.

98.     Harris poses a significant threat to Syzygy and if he does not have trade secrets in writing in his possession, he has a deep knowledge of all of Syzygy's trade secrets nonetheless.

**HARRIS'S RETURN OF THE COMPANY LAPTOP, WIPED CLEAN**

99.     Harris's company laptop was received by Syzygy via FedEx (using a company shipping label sent to him) on April 1, 2022, and Harris's entire account on the laptop was wiped clean (all data in the account erased), directly contrary to the instructions he received in the March 28 letter (**Ex. E**) to him, and he had changed his password to "password."

100.    Because the laptop had been altered, Syzygy could not see much of the activity on the machine, but it was able to learn that within the past ninety days, Harris viewed or edited 2,618 Syzygy files and *downloaded* 12,849 Syzygy files.

101.    During this same period, the view/edit/download counts for Syzygy's other managers are all less than 900 files each, raising concerns about the unusually high level of file activity and suggesting that Harris misappropriated Syzygy's confidential, proprietary, and trade-secret information in the days prior to his resignation.

102.    Since Harris wiped the laptop clean, he has destroyed company property that was only on his laptop, causing Syzygy to have to perform significant rework as the team is unable to find critical files for specific programs that Harris had in his possession.

103.    The laptop is being held in Mitchell's desk, locked, until required to produce it for this lawsuit.

104.    Syzygy could not determine what, if any, information Harris took from the company.

105.    As demonstrated herein, if Harris is allowed to work at Sherpa 6, it will cause enormous harm to Syzygy.

## AS AND FOR THE FIRST CAUSE OF ACTION:
## BREACH OF CONTRACT:  DEFENDANT'S EMPLOYMENT AGREEMENT

106.     Syzygy repeats and realleges the allegations set forth above as though fully set forth herein

107.     Syzygy and Harris entered into an Employment Agreement dated February 2018 (**Ex. B**) which contract was a condition of employment as set forth in Harris's Offer of Employment (**Ex. A**).

108.     Harris accepted employment from Syzygy and was presented with the Employment Agreement which provided the terms of Harris's employment, but failed to sign it.

109.      Adequate consideration for the Agreement was provided, including consideration for the restrictive covenants contained therein restricting Harris from working for a competitor of Syzygy for a period of one year.

110.     The Parties substantially performed the terms of the agreement, including that Harris was provided employment and that Syzygy paid him for his performance and adhered to the terms and conditions set forth in the Employment Agreement.

111.     Included in the Employment Agreement is a non-competition clause, precluding Harris from accepting employment with any competitor of Syzygy within one year of termination of his employment with Syzygy.

112.     On or about April 1, 2022 it became clear that Harris had accepted employment with Sherpa 6, a direct competitor of Syzygy, violating the terms of the non-competition clause set forth in the Employment Agreement between Syzygy and Harris.

113.     By his actions, Harris has caused and continues to cause damage to Syzygy by possessing, sharing, disclosing, and or using Syzygy's proprietary and confidential information in his own interests in the course of his employment with a direct competitor of Syzygy.

114.    By his actions, Harris has caused and continues to cause damage to Harris by possessing, sharing, disclosing, and or using Syzygy's proprietary and confidential information in the interest of its competitor, Sherpa 6, to help Sherpa 6 gain a competitive advantage over Syzygy.

115.    Syzygy cannot adequately quantify the damages that Harris caused and continues to cause insofar as Syzygy's proprietary and confidential information is, upon information and belief, being used against it to allow Plaintiff's direct competitor, now Harris's employer, Sherpa 6, to gain a competitive advantage over Syzygy in the preparation and submission of current and future proposals to federal government clients.

116.    Therefore Syzygy, having no remedy in law to make itself whole, respectfully requests that this Court impose a permanent injunction against Harris to work or be associated with Sherpa 6 or any other competitor for a period of one year, pursuant to the terms of the contract he has breached.

## AS AND FOR THE SECOND CAUSE OF ACTION: BREACH OF CONTRACT:  THE OPERATING AGREEMENT

117.    Syzygy repeats and realleges the allegations set forth above as though fully set forth herein.

118.    Syzygy and Harris entered into an Operating Agreement (**Ex. D**) dated August 14, 2020, and signed by Harris on that date, which contract provided Harris with an ownership interest in Syzygy.

119.    The Operating Agreement provided Harris with certain monetary benefits, including payments reflecting his ownership interest in Syzygy, which Harris received.

120.    A provision of the Operating Agreement included a restrictive covenant prohibiting Harris, an employee and owner of Syzygy from taking employment with a competitor of Syzygy

for a period of five years following termination of his employment, for which Syzygy provided adequate consideration.

121.    On or about April 1, 2022, it became clear that Harris accepted employment with Sherpa 6, a direct competitor of Syzygy.

122.    By doing so, Harris violated the terms of the non-competition clause set forth in the Operating Agreement between Syzygy and Harris.

123.    By his actions, Harris has caused and continues to cause damage to Syzygy by possessing, sharing, disclosing, and using Syzygy's proprietary and confidential information in his own interests to obtain employment with a direct competitor of Syzygy.

124.    Syzygy cannot adequately quantify the damages Harris caused and continues to cause insofar as Syzygy's proprietary and confidential information is, upon information and belief, being used against it to allow Syzygy's direct competitor, Sherpa 6, now Harris's employer, to gain a competitive advantage over Syzygy.

125.    Therefore Syzygy, having no remedy in law to make Syzygy whole, respectfully asks this Court to impose a permanent injunction against Harris to work or be associated with Sherpa 6 or any other competitor for a period of five years, pursuant to the terms of the contract he has breached.

## AS AND FOR THE THIRD CAUSE OF ACTION: THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030, *et seq.*

126.    Syzygy repeats and realleges the allegations made above as though fully set forth herein.

127.    Harris was in possession of a computer owned by Syzygy during the course of his employment with Syzygy and was authorized to use it in furtherance of Syzygy's business.

128.     On March 28, 2022, Syzygy gave notice to Harris telling him to "cease use of all Materials, Confidential Information, Inventions and Works . . . and disclose, return and deliver the same to the Company without retaining possession, custody or control of any of the information and execute a certification, under oath, that he has complied with this obligation." *See* **Ex. E**.

129.     Rather than return this information to Syzygy, Harris destroyed the information contained on the computer, thus accessing the computer beyond his authority to do so, and returned the computer to Syzygy wiped clean of information.

130.     Upon information and belief, Harris retained documents belonging to Syzygy when he accessed the computer, including by viewing or editing 2,618 Syzygy files and downloading 12,849 Syzygy files during the weeks and months prior to his termination.

131.     The information relative to Harris's access to Syzygy's computer was determined following a search of Syzygy's computer server, as Harris made it impossible to search the laptop itself.

132.     Syzygy has been damaged in excess of $100,000 as it has had to rework information necessary to the operation of its business that existed on the hard drive of the laptop prior to Harris's destruction of the same.

133.     Syzygy is unable to quantify any additional damages it has suffered at this time, but continues to assess the damages caused by Harris.

134.      By his acts as set forth herein, Harris as violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*

### AS AND FOR THE FOURTH CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTY PURSUANT TO 42 Pa. C.S. § 5525

135.     Syzygy repeats and realleges the allegations set forth above as though fully set forth herein.

136.   Harris in his capacities as an employee and part owner of Syzygy acted as a fiduciary to Syzygy and had a fiduciary duty to it.

137.   Harris breached his fiduciary duty to Syzygy when he accepted an offer of employment with a competitor of Syzygy in violation of the restrictive covenants he agreed to when accepting employment with Syzygy and when accepting part ownership of Syzygy.

138.   Harris further breached his fiduciary duty to Syzygy when he destroyed company information that was on a laptop provided to him by Syzygy during the course of his employment.

139.   By Harris's actions he has caused damage to Syzygy in an amount not yet calculated, including but not limited to the loss of control over Syzygy's confidential and proprietary information; the loss of commercial advantage over its competitor, Sherpa 6, to promote Harris's personal interests over those of Syzygy; and the need to do over work again that Harris had done that is lost to Syzygy by Harris's destruction of Syzygy's information.

140.   Syzygy has suffered damages prior to and as of the date of this complaint.

141.   By his actions set forth herein Harris has breached his fiduciary duty to Syzygy.

**AS AND FOR THE FIFTH CAUSE OF ACTION**
**INEVITABLE DISCLOSURE OF SYZYGY'S CONFIDENTIAL**
**AND PROPRIETARY INFORMATION**

142.   Syzygy restates and realleges the allegations set forth above as though fully set forth herein.

143.   Syzygy operates in an industry that has a high level of competition, as described in detail above.

144.   On or about April 1, 2022, it became clear that Harris had accepted a position with Syzygy's competitor, Sherpa 6, to perform the same or substantially the same position for Sherpa 6 as he has performed for Syzygy as an employee and part owner of Syzygy.

145.    Sherpa 6, as set forth above, is in direct and continual competition with Syzygy for work that is open for competitive bidding by federal government clients and currently is in competition on active RFPs by federal government clients.

146.    Harris's new employer, Sherpa 6, did not try to prevent Harris from using or disclosing Syzygy's trade secrets, which are highly valuable to both Syzygy and Sherpa 6, despite being informed that Harris is subject to a non-competition agreement specifically precluding his employment with Sherpa 6, going so far as to obtain security clearance for Harris as an employee of Sherpa 6 and to identify Harris as one of Sherpa 6's "key personnel" on its responses to RFPs, a role Harris had for Syzygy when he was Syzygy's employee and part owner.

147.    Harris engaged in conduct when leaving the employment of Syzygy that demonstrates bad faith, including without limitation: (1) being dishonest with Syzygy's owner about his reasons for leaving employment; (2) failing to disclose where he intended to work after leaving his employment; (3) destroying company property, specifically the information contained on a laptop computer owned by Syzygy and provided to Harris as an employee of Syzygy for use solely in Syzygy's interests; and (4) pursuing a security clearance as an employee of Sherpa 6.

148.    Harris, if not enjoined, will intentionally use Syzygy's confidential, proprietary, and trade-secret information that he has acquired as a result of his employment and ownership of Syzygy and which he possesses now by virtue of his misconduct, to the detriment of Syzygy in its business operations.

149.    Based on the foregoing, Harris will inevitably disclose Syzygy's trade secrets to its direct competitor and Harris's new employer, Sherpa 6, in the absence of prompt judicial intervention.

150.    Syzygy, having no remedy in law to make Syzygy whole, respectfully asks this Court to impose a permanent injunction against Harris to work or be associated with Sherpa 6 for a period of five years, pursuant to the terms of the contract he has breached.

## AS AND FOR THE SIXTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

151.    Syzygy repeats and realleges the allegations set forth above as though fully set forth herein.

152.    Syzygy is currently engaged in work for which it was awarded contracts as a result of various RFPs issued by federal government clients.

153.    Some of the work awarded to Syzygy as a result of competitive bidding—a process in which Harris was fully immersed and with which Harris has intimate familiarity—provides for additional competitive bidding for work in years in which the awarded contracts continue.

154.    By accepting employment with Sherpa 6—a director competitor of Syzygy—on the same contracts for which Syzygy has bid, Harris has put Syzygy's continued ability to compete for these contracts at significant risk.

155.    Harris's conduct while accepting employment with Syzygy's competitor as set forth herein demonstrates that Harris purposefully acted to harm Syzygy's relationships with its current and prospective customers, without any excuse or justification for his actions.

156.    As a result of his harmful and deliberate conduct, Harris has damaged Syzygy's ability to engage in the contracts awarded to it and further damaged Syzygy's ability to maintain its contractual rights with third parties going forward, causing Syzygy to lose or be at substantial risk to lose millions of dollars in revenue.

157.    Based on the foregoing, Syzygy seeks injunctive relief to prohibit Harris from further interference in its contractual relationships and to prevent Harris from continuing

employment with Sherpa 6 or accepting employment with any competitor of Syzygy for the next five years, as provided for in the Parties' Operating Agreement.

## AS AND FOR THE SEVENTH CAUSE OF ACTION:
### CONVERSION OF SYZYGY'S PROPERTY

158.    Syzygy restates and realleges the allegations set forth above as though fully set forth herein.

159.    Syzygy has taken significant measures to safeguard its confidential and proprietary information, including limiting access to the information, requiring access only through approved security measures, and limiting the use of Syzygy's property, including its computers, to the benefit of Syzygy only.

160.    Harris, as a trusted employee and part owner of Syzygy, had possession of Syzygy's proprietary information when he had possession of Syzygy's laptop for use as an employee and owner of Syzygy.

161.    Harris accessed, downloaded and, upon information and belief, copied that information in the last ninety days of his employment with Syzygy with no legitimate business reason to do so.

162.    Because Harris then destroyed Syzygy's proprietary information that was on Syzygy's laptop, not only is Syzygy unable to determine what has become of its proprietary and confidential information and specifically, whether that information has been provided to its competitor, Sherpa 6, but Syzygy has also had to do work over again that Harris had performed and that was stored on the hard drive of the laptop and made inaccessible by Harris's deliberate act when he wiped the laptop clean of information prior to returning it to Syzygy.

163.    Based on the foregoing, Harris has misappropriated Syzygy's property, *i.e.*, its proprietary and confidential information, to use for his own benefit to the detriment of Syzygy.

164.     Syzygy seeks an award of damages in an as yet undetermined amount to make it whole for the loss of its property caused by Harris and a permanent injunction prohibiting Harris from working for Sherpa 6 or any competitor of Syzygy for five years as agreed to in the Parties' Operating Agreement.

## AS AND FOR THE EIGHTH CAUSE OF ACTION:
## PENNSYLVANIA UNIFORM TRADE SECRETS ACT

165.     Syzygy repeats and realleges the allegations made above as though fully set forth herein.

166.     The Pennsylvania Uniform Trade Secrets Act ("PUTSA") prohibits any person from utilizing the trade secrets of another for that person's commercial advantage. The PUTSA, 12 P.S. § 5302, defines trade secrets to include:

> Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, or process that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

167.     Syzygy owned trade secrets as set forth above and took care to protect those secrets, limit access to them and keep them confidential.

168.     Harris acquired Syzygy's trade secrets by virtue of his work on a laptop owned by Syzygy when Harris was an employee and part owner of Syzygy.

169.     Harris accessed, downloaded and, upon information and belief, copied Syzygy's trade secrets during the weeks and months prior to his termination with no legitimate business reason to do so.

170.    Harris then destroyed Syzygy's trade secrets that were on Syzygy's laptop, leaving Syzygy unable to determine what has become of its trade secrets and specifically, whether its trade secrets have been provided to its competitor, Sherpa 6, and additionally, causing Syzygy to do work over again that Harris had performed and that was stored on the hard drive of the laptop and made inaccessible by Harris's deliberate act when he wiped the laptop clean of information prior to returning it to Syzygy.

171.    Based on the foregoing, Harris has misappropriated Syzygy's trade secrets, to use for his own benefit to the detriment of Syzygy.

172.    As a direct and proximate result of Harris's misappropriation of Syzygy's trade secret proprietary and confidential client information, Syzygy has suffered and will continue to suffer irreparable financial harm, loss of goodwill, and an irreparable loss of the confidentiality of information contained in its records.

173.    Syzygy seeks an award of damages in an as yet undetermined amount to make it whole for the loss of its trade secrets caused by Harris and a permanent injunction prohibiting Harris from working for Sherpa 6 or any competitor of Syzygy for five years as agreed to in the Parties' Operating Agreement as the only means available to Syzygy to protect its trade secrets.

**AS AND FOR THE NINTH CAUSE OF ACTION:**
**DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1831, *et seq.***

174.    Syzygy repeats and realleges the allegations made above as though fully set forth herein.

175.    The federal Defend Trade Secrets Act of 2016 ("DTSA") forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  *See* 18 U.S.C. § 1832, *et seq.*

176.    The DTSA broadly defines "trade secrets" to include "all forms and types of financial, business, scientific, technical, economic or engineering information" that derive independent economic value from not being generally known or readily accessible by the public using proper means and which the owner has taken reasonable steps to protect. 18 U.S.C. § 1839(3).

177.    Syzygy owned trade secrets as set forth above and took care to protect those secrets, limit access to them and keep them confidential.

178.    Harris acquired Syzygy's trade secrets by virtue of his work on a laptop owned by Syzygy when Harris was an employee and part owner of Syzygy.

179.    Harris accessed, downloaded and, upon information and belief, copied Syzygy's trade secrets during the weeks and months prior to his termination with no legitimate business reason to do so.

180.    Harris then destroyed Syzygy's trade secrets that were on Syzygy's laptop, leaving Syzygy unable to determine what has become of its trade secrets and specifically, whether its trade secrets have been provided to its competitor, Sherpa 6 and additionally, causing Syzygy to do work over again that Harris had performed and that was stored on the hard drive of the laptop and made inaccessible by Harris's deliberate act when he wiped the laptop clean of information prior to returning it to Syzygy.

181.    Based on the foregoing, Harris has misappropriated Syzygy's trade secrets, to use for his own benefit to the detriment of Syzygy.

182.    As a direct and proximate result of Harris's misappropriation of Syzygy's trade secret proprietary and confidential client information, Syzygy has suffered and will continue to

suffer irreparable financial harm, loss of goodwill, and an irreparable loss of the confidentiality of information contained in its records.

183.    Syzygy seeks an award of damages in an as yet undetermined amount to make it whole for the loss of its trade secrets caused by Harris and a permanent injunction prohibiting Harris from working for Sherpa 6 or any competitor of Syzygy for five years as agreed to in the Operating Agreement as the only means available to Syzygy to protect its trade secrets.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

A.    Enter immediately a Temporary Restraining Order against Defendant Harris providing as follows:

1. Enjoining Harris from violating the Parties' Employment Agreement;

2. Enjoining Harris from violating the Parties Operating Agreement;

3. Enjoining Harris from directly or indirectly using, disclosing, or transmitting for any purpose any information contained in Syzygy's confidential, proprietary and trade-secret information;

4. Enjoining Harris from directly or indirectly soliciting any business from any client of Syzygy with whom Harris worked during his employment with Syzygy;

5. Enjoining Harris from directly or indirectly soliciting any business from any client of Syzygy through the use of Syzygy's confidential, proprietary, or trade-secret information;

6. Enjoining Harris from working in any capacity for Sherpa 6 or any other competitor based on the inevitable-disclosure theory;

7. Requiring Harris to return to Syzygy all originals, copies, or other reproductions, in any form whatsoever, of any record or document containing Syzygy's confidential information;

8. Requiring Harris to immediately provide all devices, including all computers, laptops, flash drives, PDAs, or smartphones on

which he viewed, stored or otherwise accessed any of Syzygy's information to permit Syzygy to review the devices for any of Syzygy's proprietary, confidential, or trade-secret information;

9. An accounting for and payment of any compensation, commission, bonus, salary, gratuity, emolument, or other gain received, directly or indirectly, by Harris connected to Harris's employment with Sherpa 6;

10. Costs, including reasonable attorneys' fees; and

11. Any other relief the Court deems appropriate.

B.     Continue the Temporary Restraining Order in full force and effect through and including a hearing before this Court on Plaintiff's request for the entry of a Preliminary Injunction and set such a hearing at a date convenient for the Court.

C.     Following the hearing on the request for a preliminary injunction, convert the Temporary Restraining Order into a Preliminary Injunction, to remain in effect until the merits of the parties' dispute are resolved at trial;

D.     Grant Plaintiff such other and further relief as the Court deems to be just and equitable under the circumstances.

Respectfully submitted,

**JACKSON LEWIS P.C.**

Dated: April 14, 2022

*/s/ Marjorie N. Kaye, Jr.*
Marjorie N. Kaye, Jr. (PA No. 315093)
Daniel F. Thornton (PA No. 318431)
Three Parkway
1601 Cherry Street, Suite 1350
Philadelphia, PA 19102
T: (267) 319-7802
F: (215) 399-2249
marjorie.kaye@jacksonlewis.com
daniel.thornton@jacksonlewis.com

*Attorneys for Plaintiff*

## <u>VERIFICATION</u>

Pursuant to 28 U.S.C. § 1746, I verify under penalty of perjury that the factual allegations set forth in the foregoing Verified Complaint are true and correct to the best of my personal knowledge.  Executed on April 14, 2022.

_Wesley Mitchell_
_____
Wesley Mitchell
Founder and President
Syzygy Integration LLC

4/14/2022

4866-3750-0187, v. 3

35