IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SYZYGY INTEGRATION LLC | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| BRYAN HARRIS | : | NO. 22-1466 |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

Bartle, J.                                                    July 21, 2022

        Plaintiff Syzygy Integration LLC has sued defendant
Bryan Harris for breach of contract, breach of fiduciary duty,
inevitable disclosure of confidential and proprietary
information, as well as for violations of the Pennsylvania
Uniform Trade Secrets Act, 12 Pa. Cons. Stat. §§ 5301 et seq.,
and the Defend Trade Secrets Act, 18 U.S.C. §§ 1831, et seq.[1]
These claims stem from Harris's employment at and termination
from Syzygy and his employment thereafter by Sherpa 6, an
alleged competitor.

        Upon filing the complaint, Syzygy moved for a
temporary restraining order and a preliminary injunction to

_____

1.   On May 25, 2022, following a motion to dismiss by Harris,
the parties agreed to a dismissal of the breach of contract
claim as pertains to Harris's "employment agreement" with
Syzygy, the breach of contract claim as pertains to the
"operating agreement" insofar as that claim related to customer
non-solicitation, the Computer Fraud and Abuse Act claim, and
the tortious interference with contractual relations claim.
This stipulation made moot the motion of Harris to dismiss.

prevent Harris from working for Sherpa 6 in violation of his operating agreement with Syzygy.  The court denied the request for a temporary restraining order.

Following an expedited discovery schedule, the court held an evidentiary hearing on Syzygy's motion for a preliminary injunction to enforce the operating agreement and to enjoin Harris from continuing his employment with Sherpa 6.  The court now makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.[2]

I

To obtain a preliminary injunction, a moving party must establish:  "(1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted."  Reilly v. City of Harrisburg, 858 F.3d 173, 176 (3d Cir. 2017).  In addition, the district court must also consider, when relevant, "(3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest."  Id. The first factor requires that the moving party make a "showing

_____

2.   The court notes that federal question jurisdiction exists in this action pursuant to 28 U.S.C. § 1331 due to the presence of sufficiently substantial federal claims in plaintiff's well-pleaded complaint.  See Metropolitan Life Ins. Co. v. Price, 501 F.3d 271, 275-77 (3d Cir. 2007).  Plaintiff's claim under the Defend Trade Secrets Act, 18 U.S.C. §§ 1831, still remains.  The court therefore need not address whether it also has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

significantly better than negligible" that it can win on the merits.  Id. at 179.  It does not have to establish that its ultimate success is "more likely than not."  Id.  As for the second factor, the moving party must show "that it is more likely than not to suffer irreparable harm in the absence of preliminary relief."  Id.

Once the moving party meets the threshold for the first two factors, the court must balance all four factors in deciding whether to grant a preliminary injunction.  Id. at 176. "District courts have the freedom to fashion preliminary equitable relief so long as they do so by 'exercising their sound discretion.'"  Id. at 178-79 (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008)).

II

Wesley Mitchell founded Syzygy in 2016 to solve certain tactical operation problems for the military, law enforcement, and other related federal agencies.  While Syzygy's largest customer is the Department of Homeland Security, it also does work for the Department of Defense and other clients in the defense sector.  Syzygy builds and supplies products, develops software, and performs services related to sensor integration, situational awareness, tactical radio integration and training, and communication integration.

A large part of Syzygy's business relates to "TAK," which stands for tactical assault kit or team awareness kit. TAK is a situational awareness tool that helps the user find precise locations on the globe for uses such as deploying GPS-guided weapons.  The Government made TAK open-source code available to the public in August 2020.  Syzygy developed TAK for integration with i-phone operating systems known as iTAK. As of April 2022, Syzygy now offers iTAK as an application for mobile devices.  Syzygy also works on ATAK, which is TAK for Android devices.

Syzygy's premier product is a "SNAP" box, or sensor network access point box, which provides communication integration, sensor integration, and enterprise integration to cloud servers.  Syzygy also works on the ARGOS Dismounted Program which helps soldiers see objects remotely and at night.

Syzygy competes on requests for proposals ("RFPs") that the Government issues for products or services for the military or for other agencies.  Sometimes for large RFPs Syzygy is a subcontractor for a prime contractor which forms a team of subcontractors with a teaming agreement.  There are no contractual provisions binding the prime contractor to the respective subcontractors or visa versa.  Once the contract is awarded to the prime contractor, the prime contractor works out contracts with subcontractors, either the ones from the teaming

agreement or new ones.  The time between the Government's
issuance of the RFP and the negotiation of subcontracts can be
as much as fifteen to eighteen months, in addition to the time
it takes the various teams to prepare for an anticipated RFP
before it is released.

Mitchell hired Harris as Syzygy's first employee in
2018.  Harris had previous work experience serving in the United
States Air Force as a Joint Terminal Attack Controller ("JTAC")
and as a civilian special project coordinator for the United
States Navy Special Warfare Development Group.  He also worked
at the United States Army Night Vision Lab which is now known as
the TAK Product Center.  In these jobs he specialized in landing
planes and helicopters in precarious situations, shaping
procedures for deploying precision weapons, and working in
communications and emerging technology, particularly mobile
devices and situational awareness including ATAK.  Harris is
regarded as an expert in TAK.

 Harris started at Syzygy as a senior systems engineer
hired to work on sensor integration and communication
integration.  He served as a project manager to develop iTAK and
was involved with other projects including ARGOS.

During his time at Syzygy, Harris developed business
and had responsibilities in recruiting, firing, and evaluating
personnel.  As part of this work, Harris had extensive access to

most aspects of Syzygy's business, including employee salary
information, rate structures, customer contacts, vendor lists,
suppliers, financial statements, and budgets.  Harris, however,
was not privy to Syzygy's accounting system, Quick Books.

On August 14, 2020, some two years after beginning his
employment with Syzygy, Harris signed what was termed an
operating agreement.  It provided him with a 2% membership
interest in the company as an "employee member" while Mitchell
retained the remaining 98% as a "management member."  The
agreement was retroactive to the beginning of 2020.

Paragraph 5.9 of the operating agreement provides that
Harris will not:

> engage in, or invest in, own, operate,
> manage, finance, control or participate in
> the ownership, operation, management,
> financing or control of, act as a consultant
> or advisor to, be employed by . . . any
> individual or entity engaged in, or planning
> to become engaged in . . . any other
> business whose products, services or
> activities compete in whole or in part with
> any other business engaged in by the
> Company, in the United States.

This covenant is to run for "so long as such Employee Member is
a Member of the Company and for a period of five (5) years after
the sale of his Membership interest for any reason."  Once a
member desires to withdraw from the company, the operating
agreement provides that the company shall have the right to
purchase the member's entire interest with written notice of

such election "within twelve (12) months after the receipt of the withdrawing Member's notice of intention to withdraw."

The operating agreement also places obligations on Syzygy.  One such obligation requires it to issue "a certificate evidencing the Units held by such Member."  The agreement further calls for Syzygy to provide the members with "a customary financial report," which includes "a balance sheet . . . and the related statements of operations and changes in financial position" within ninety days of the end of the fiscal year as well as a copy of the company's income tax return. Harris never received a membership certificate, a financial report, or a copy of Syzygy's income tax returns while an employee member, although he did have access to financial and budgetary information upon request.

In December 2019, Harris became Syzygy's Director of Operations and served in this role until he left Syzygy in March 2022.  As time went on, Harris expressed frustration with how things were run at Syzygy and voiced discontent over his role. In the spring of 2021, he spoke and corresponded with Mitchell about assuming the responsibilities of an Executive Vice President at the company.

In April 2021, Harris inquired of Mitchell about his draw as a Syzygy employee member for 2020.  On September 1, 2021, Mitchell gave Harris a personal check for $30,000 and

wrote on the memo line "Thank you!"  This amount reflected slightly in excess of 2% of the total profits of Syzygy for 2020 which turned out to be $1,416,341.  Syzygy, however, did not provide Harris with a 2020 K-1 form for his taxes or reflect this membership distribution in his W-2 for tax year 2020.

Thereafter, in November 2021, Harris reached out to Joseph Dames, the founder and Chief Executive Officer of Sherpa 6, to initiate discussions about the possibility of Harris working at Sherpa 6.  Sherpa 6 works in the defense contracting sector on technical and engineering services.  In particular, Sherpa 6 focuses on service for the United States Army in mission command systems.  Part of its work is on integrating tactical radios for the Army.  It makes sure that mobile devices are interoperable, that is that the interface matches, with the Army radios and communication systems.  It also provides mobile device management to the Army through a system it calls Watchtower.  Mobile device management keeps track of what mobile devices the Army is using in the field and ensures the mobile devices are in compliance.

Dames and Mitchell have frequently exchanged text messages and e-mails over the years in which they discussed opportunities to team up and share skillsets.  Dames has shared recruiting strategies with Mitchell and suggested pairing Sherpa 6's Watchtower with Syzygy's iTAK.  Dames has also

introduced Mitchell to some of Sherpa 6's customers who may be interested in some of the products and services Syzygy provides that Sherpa 6 does not.  No collaboration or joint efforts on RFPs, however, ever came to fruition and no discussions ever resulted in business either for Syzygy or Sherpa 6.

After Harris and Dames met in November 2021, Harris sent Dames his resume and interviewed at Sherpa 6 in February 2022.  Harris gave a "verbal yes" to the oral job offer of Sherpa 6's Chief Operating Officer, Jim Hamilton, on March 8, 2022 and indicated an anticipated start date of April 4, 2022. The next day Sherpa 6 sent him a formal offer via e-mail. Harris, however, let Dames know he would not open the letter until he had talked to Mitchell.

On March 16, 2022, Harris gave Mitchell his resignation letter and informed Mitchell his last day would be April 1, 2022.  Two days later, on March 18, 2022, Dames and Mitchell spoke by telephone during which Dames told Mitchell that Harris had sent his resume to Dames.  Mitchell advised Dames about Harris's non-compete agreement.

On March 21, 2022, Harris signed his offer of employment with Sherpa 6 with a start date of April 4, 2022.  In it he agreed not to bring to Sherpa 6 any confidential information from prior work experiences or to divulge any confidential information.  On March 25, 2022, Mitchell cut off

9

Harris's access to Syzygy devices and records.  On March 28, 2022, Syzygy terminated Harris's employment and sent him a termination letter and separation agreement via e-mail on March 31, 2022.  Harris never received this letter and separation agreement because it was sent to the wrong e-mail address.  Mitchell declined Harris's request to waive the non-compete covenant.

After litigation in this matter commenced on April 14, 2022, Syzygy issued a check on May 11, 2022 to Harris for $24,352 as a buy-out of his membership shares in accordance with the operating agreement.  Two days later Syzygy sent the check, along with a draft K-1 for tax year 2021, to counsel for Harris. The $24,352 represented 2% of the net profit for 2021. Following this buy-out, Mitchell would once again own 100% of Syzygy.  Harris has not yet cashed that check.

Since starting at Sherpa 6 on April 4, 2022 as a senior project manager, there is no evidence that Harris has worked on any business development.  Nor has he worked on iTAK, ARGOS, or SNAP for Sherpa 6 or attempted to recruit any Syzygy employees to work at Sherpa 6.  There is nothing to show that he has played any role in responding to any RFPs for Sherpa 6.

III

Syzygy, as noted above, has remaining claims for breach of the operating agreement, breach of fiduciary duty,

inevitable disclosure of proprietary information, conversion, the Pennsylvania Uniform Trade Secrets Act, and the Defend Trade Secrets Act.  At this point, however, Syzygy only seeks a preliminary injunction as relates to the breach of the non-competition provision of the August 14, 2020 operating agreement.

Under Pennsylvania law, to succeed on a claim for breach of contract, a plaintiff must prove:  "(1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages."[3] Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C., 137 A.3d 1247, 1258 (Pa. 2016).

Although materiality of a breach is generally an issue of fact for the jury, Pennsylvania courts have affirmed findings of materiality as a matter of law "where the breach goes directly to the essence of the contract." American Diabetes Ass'n v. Friskney Family Tr., LLC, 177 F. Supp. 3d 855, 868 (E.D. Pa. 2016).  Pennsylvania courts look to the Restatement (Second) of Contracts to determine whether a breach is material by evaluating the extent the injured party will be deprived of the benefit which it reasonably expected and the extent it can be compensated for such deprivation, whether the party which

---

3.    The parties agree that, pursuant to the terms of the operating agreement, Pennsylvania law applies in this action.

failed to perform will cure its failure, and whether the party
which failed to perform acted in accordance with standards of
good faith and fair dealing.  Id. (citing Restatement (Second)
of Contracts § 241).  No single factor is dispositive.  Id.

While restrictive covenants, including non-competition
covenants, are not favored under Pennsylvania law, they are
enforceable to the extent they "are incident to an employment
relationship between the parties; the restrictions imposed by
the covenant are reasonably necessary for the protection of the
employer; and the restrictions imposed are reasonably limited in
duration and geographic extent."  Hess v. Gebhard & Co., 808
A.2d 912, 917 (Pa. 2002); see also PharMethod, Inc. v. Caserta,
382 F. App'x 214, 219 (3d Cir. 2010).  In determining whether
the restraints are reasonable, courts have often looked to the
temporal and geographic elements of the covenants.  Hess, 808
A.2d at 918.  These restrictions must "be reasonably related to
the protection of a legitimate business interest" and not just
to "eliminate competition per se."  Id.  In examining the
geographic limits in a covenant, courts uphold covenants without
limits or with broad limits "only where the employee's duties
and customers were equally broad."  PharMethod, Inc., 382 F.
App'x at 220.

A legitimate business interest is therefore a
"condition precedent to the validity of a covenant not to

compete.   Generally, interests that can be protected through
covenants include trade secrets, confidential information, good
will, and unique or extraordinary skills."  Hess, 808 A.2d at
920.  The court must balance "the employer's protectible
business interests against the interest of the employee in
earning a living in his or her chosen profession, trade or
occupation, and then balance[] the result against the interest
of the public."  Hess, 808 A.2d at 920.

       If the covenant's restrictions are broader than
necessary to protect the employer, "a court of equity may grant
enforcement limited to those portions of the restrictions that
are reasonably necessary for the protection of the employer."
Id.  In other words, the court may "blue pencil" the agreement
to ensure that the restrictive covenant is "narrowly tailored to
protect an employer's legitimate interests."  PharmMethod, Inc.,
382 F. App'x at 220.

       Finally, under Pennsylvania law a restrictive covenant
must be supported by adequate consideration.  See Pulse Techs.,
Inc. v. Notaro, 67 A.3d 778, 781-82 (Pa. 2013).  If the covenant
is executed after the commencement of employment, the
continuation of employment, even if that employment is at-will,
is not sufficient consideration.  Id. at 782.  Instead there
must be new consideration that includes "'a change in the

CRITICAL

conditions of employment.'"   Id. at 781 (quoting Maint.

Specialties, Inc. v. Gottus, 314 A.2d 279, 281 (Pa. 1974)).

IV

Harris signed the operating agreement in August 2020,

long after he began his employment with Syzygy.   There was,

however, new consideration provided beyond his continued

employment.   The operating agreement gave Harris for the first

time a 2% membership interest in Syzygy.   Pursuant to the

operating agreement, Mitchell wrote Harris a check in September

2021 for $30,000 which was slightly in excess of 2% of the

profits to which he was entitled.   Mitchell again wrote Harris a

check in May 2022, this time for $24,352, to buy out Harris's

interest in the company.

The court finds not credible Harris's testimony that

the $30,000 check from Mitchell, Harris's employer, was a gift.

It was payment for what he was owed for his 2% membership

interest in Syzygy.   The operating agreement was supported by

adequate consideration.   Syzygy has proven that it is reasonably

probable the operating agreement constitutes a valid contract.

The court next turns to whether Harris breached that

agreement by going to work for Sherpa 6 immediately after

leaving Syzygy.   As previously stated, the operating agreement

prohibits Harris from being employed by "any other business

whose products, services or activities compete in whole or in
part with any other business engaged in by" Syzygy.

The majority of the work that Syzygy does is in the
service area by providing labor and field support rather than
building products.  Both Syzygy and Sherpa 6 do work for and
compete on contracts for the Department of Defense.  While
Sherpa 6 primarily does work for the United States Army, Syzygy
does work for various entities, including the Army.  Sherpa 6
focuses on sensor and communication integration as does Syzygy.
Both companies work on integrating tactical radios and
communication devices.

Although Sherpa 6 does not currently work on iTAK or
on TAK services generally, it does do work on ATAK for the Army.
Syzygy also does work on ATAK.  Syzygy performs TAK integration,
training, and support services for the Department of Defense,
among other agencies and entities, for both ATAK and iTAK.
Harris did not work on mobile device management while at Syzygy,
but Syzygy obtained a contract in September 2021 to do mobile
device management work for the Department of Homeland Security.
Sherpa 6 does significant work on mobile device management.  The
two companies overlap enough in the services they provide so
that they are competitors "in whole or in part."  See e.g.,
Omicron Sys., Inc. v. Weiner, 860 A.2d 554, 560-61 (Pa. Super.
2004).

Harris has testified that he has not worked on any RFPs or projects that compete with Syzygy.  That testimony, even if true, is irrelevant as to his breach of the operating agreement.  Under its terms, Harris is prohibited from working for or becoming engaged in "any other business" which competes "in whole or in part" with any business engaged in by Syzygy. Sherpa 6, the court has found, competes with Syzygy.

In addition to arguing that Sherpa 6 and Syzygy are not competitors, Harris relies on the alleged breaches of the operating agreement by Syzygy to assert that he was relieved of his duty to perform under the operating agreement.  When a party materially breaches a contract, the non-breaching party is relieved of any continuing duty of performance under the contract.  LJL Transp., Inc. v. Pilot Air Freight Corp., 962 A.2d 639, 648 (Pa. 2009).  A party who has materially breached its duty to perform may not insist upon the performance of the contract by the other party.  Id.

Harris claims that Syzygy did not perform its duties under the operating agreement by failing to provide a copy of the company's tax forms, a membership certificate, tax documentation accompanying a membership distribution, and customary financial reports, including balance sheets and statements.

Mitchell does not dispute that Syzygy did not provide these items to Harris.  These omissions, however, were not material.  Harris did not demonstrate that he was injured in any way by these failures to perform under the operating agreement or that he was prevented from performing his duties under the contract.  He never requested a certificate of membership or the various tax and financial information to which he was entitled.  Moreover, Harris had access to financial information upon request and had numerous discussions with Mitchell about Syzygy's financials and budgets.

Syzygy relied on an accounting firm that has since gone out of business to do its taxes.  Syzygy has sought to remedy the deficiencies that accrued as a result.  It eventually provided Harris with a K-1 for the tax year 2021.

The court must next determine whether the restrictive covenant in the operating agreement is enforceable.  As noted above, restrictive covenants must be reasonably necessary to protect the employer's legitimate business interest.  Hess, 808 A.2d at 917.

The non-competition covenant is incident to the employment relationship between Syzygy and Harris as it was a part of the operating agreement Harris signed to become an employee member and concerns competing on employment matters with another company.  It protects Syzygy's ability to compete

on contracts against companies such as Sherpa 6 and obtain work for its services by ensuring that employees with confidential and proprietary information do not work for a competitor and do not take the skills and experiences they gained at Syzygy to a competitor for a period of five years.

While at Syzygy, Harris had access to employee salary information, rate structures, customer contacts, vendor lists, suppliers, financial statements, and budgets.  Harris also helped Syzygy run its business, reached out to potential contacts, recruited new employees, and oversaw personnel. Furthermore, he worked extensively on various projects at Syzygy, including building iTAK from scratch.  This gave him significant access to Syzygy's trade secrets.  While the court recognizes that Harris brought his extensive TAK knowledge and other specialized skills to Syzygy from his prior work experiences, he also learned new procedures and processes and obtained new information in working on Syzygy's products and services that would be beneficial to a competitor.

Syzygy's non-competition covenant therefore protects a legitimate business interest.  It is reasonably necessary for Syzygy to have a non-competition covenant to protect these interests from its direct competitors.

The court is mindful that the injunction Syzygy seeks will prevent Harris from working at Sherpa 6.  Harris certainly

has an interest in earning a living in his chosen profession. He is a highly skilled professional in this field and this restraint would deprive him of his current position.

Syzygy nonetheless has a stronger interest in protecting its confidential information and trade secrets. Harris had the opportunity to negotiate different terms to the non-competition covenant or to decline the employee membership for the sake of professional freedom.  He also voluntarily chose to leave Syzygy for Sherpa 6 rather than seek employment with other entities that are not direct competitors with Syzygy. Mitchell testified about the ten to twelve companies which compete directly with Syzygy, including Sherpa 6.  There are other companies within this field for whom Harris could work, as well as government agencies and entities who would value Harris's skills.  The public also has an interest in having contracts enforced.  The balance of interests tilts in Syzygy's favor to have this non-competition covenant enforced.

The non-competition covenant, however, should only be enforced to the extent reasonably necessary and must be narrowly tailored to protect the employer's legitimate business interests.  See Hess, 808 A.2d at 920.  The non-competition covenant has no geographic limitations.  This is proper, as Syzygy does work for the federal government and competes with entities across the country for this business.

19

The temporal scope of the covenant, five years from the sale of Harris's membership interest, is more than is reasonably necessary to protect Syzygy's interest.  The court recognizes that Government contracts take significant time to be released and get negotiated.  Even so, recognizing that Pennsylvania law disfavors restrictive covenants, five years is more than is reasonably necessary to protect Syzygy's interests. As the time from the release of an RFP to negotiations with subcontractors takes about fifteen to eighteen months, in addition to the time it takes to prepare for an RFP before it is released, the court finds that two years is a reasonable restriction.  Furthermore, it is reasonable that this restriction run from when the employee member goes to work for a competitor, rather than from the sale of his membership interest.  The court will therefore exercise its discretionary power to "blue pencil" the restrictive covenant and reduce the temporal scope from five to two years beginning with the date that defendant Harris started at Sherpa 6, that is April 4, 2022.  The restrictive covenant will be in effect until April 3, 2024.

Syzygy has established a reasonable probability of eventual success in this litigation on its claim for breach of contract since it had a valid operating agreement with Harris, including its restrictive covenant, and it is "significantly

better than negligible" that Syzygy will be able to prove that
Harris breached that agreement by working for Sherpa 6 and that
harm will result.  See Reilly, 858 F.3d at 179.

Syzygy has also demonstrated that it is more likely
than not that it will be irreparably injured if Harris is not
enjoined from working for Sherpa 6 since he will be working for
a direct competitor of Syzygy.  Without any injunction, Syzygy
will unfairly face the loss of contracts and potential business
opportunities.

The court also considers that, if granted, the
injunction will harm Harris in preventing him from working for
his chosen company.  Harris, however, is a highly skilled
individual who can take those skills to a variety of employers.
Sherpa 6 is not the only company for whom he can work.  He also
has the membership interest in Syzygy that was paid to him upon
his departure to help bridge the gap as he looks for new
employment that is not in competition with Syzygy.

In addition, the public has an interest in the
enforcement of contracts that were voluntarily entered into and
voluntarily breached.  Balancing all the required factors, this
court will grant a preliminary injunction for a two-year period
in favor of plaintiff Syzygy Integration LLC and against
defendant Bryan Harris.